## BRINKLEY v. LOUISVILLE & N. R. CO.

(Circuit Court, W. D. Tennessee. June 23, 1899.)

**1. APPEAL—POWER OF CIRCUIT COURT TO DENY.**

The allowance of an appeal by a circuit court is not a matter of course, though a proper application therefor is seldom denied; and where a suit, as disclosed by the bill, is clearly not within the jurisdiction of that or the appellate court, and has been dismissed on that ground, and is, moreover, so manifestly vexatious and without legal merit that it is impossible to be maintained in any court, and the court would have been justified in striking the bill from its files, an application for an appeal in forma pauperis will be denied.

**2. SAME—IN FORMA PAUPERIS—STATUTE.**

Although it be a proper construction of Act July 20, 1892 (27 Stat. 252, c. 209), that an appeal may be prosecuted in forma pauperis, the circuit court has authority, under section 4 of that act, to refuse the privilege to a litigant, if it deems the cause unworthy of a trial, or is satisfied that the alleged cause of action is frivolous or malicious.

## On Application for Appeal.

On the 6th of December, 1898, the plaintiff, describing himself as a "resident of San Joaquin county, California," filed this bill, describing the railroad company only as "defendant"; these descriptions, such as they are, being found only in the caption. The bill is drawn in four numbered paragraphs, and, being brief, will be here inserted as a part of this statement of the case, to speak for itself, as follows:

"To the Chancellor of the Court of Equity in the United States Circuit Court of the Western District of Tennessee.

"W. A. Brinkley, Resident of San Joaquin County, California, Complainant, v. Louisville & Nashville R. R. Co., Defendant.

"(1) Complainant sues for revival of judgment by verdict of jury rendered June 15, 1887, in circuit court of Shelby county, in case known as 'W. A. Brinkley v. Louisville & Nashville R. R. Co.'

"(2) The facts are as follows: Complainant bought a first-class ticket at Brownsville to Memphis, Tenn. When he entered the car he was assaulted by brakeman of the train at the same time defendant cocked a pistol and pointed in his face, thus ordering out of car. Complainant brought suit in justice court of Shelby county, which gave judgment for complainant for the sum of $100. Defendant made little or no defense, but appealed to the circuit court of Shelby county. Upon trial in the aforesaid court, by written instrument defendant acknowledged and confessed the whole transaction.

"(3) Defendant then warned the jury, through attorney, against the danger to which they would subject their wives and daughters if they recognized complainant's right by giving verdict according to the law and evidence. Following this instruction, the jury rendered verdict contrary to the evidence in the case established by complainant and acknowledged by defendant, as papers in the case will show. The spirit of persecution exhibited by defendant against complainant, and the effect of the verdict rendered contrary to the law and evidence, resulted in a mental prostration which impaired him for service more than thirty days, and enfeebled him more than two years, but he has never been sound as before.

"(4) Complainant's financial capacity, after having spent $300 trying to redress his wrongs upon said strong corporation in the within-mentioned and previous case, compelled him to cease litigation, for want of means, until now. Wherefore complainant prays that the aforesaid judgment be set aside, vacated, and made void, and that defendant pay to complainant:

| | | |
|---|---|---|
| The amount as adjudged by justice court | $ 100 | 00 |
| And the interest on same from June 15, '87 | 69 | 00 |
| Additional for assault and breach of my civil and equal rights... | 675 | 07 |
| Fare from Brownsville, Tenn., and return, for three witnesses, nine trips | 30 | 60 |
| Five witness fees, 36 days | 54 | 00 |
| For the personal injury | 1,200 | 00 |
| | $2,128 | 67 |

—And that a copy of the papers used in the aforesaid trial, June 15, 1887, especially the instrument which defendant used in acknowledging and confessing the deed perpetrated upon complainant, that the same be ordered and procured for this testimony in this case. Complainant prays further that scire facias be issued upon defendant, allowing ten days to appear and plead, and that defendant be charged with all cost in this case.

"W. A. Brinkley, 122 Dunlap St.

"Sworn to and subscribed before me 6th December, 1898.

"W. B. Weisiger, D. C."

As originally drawn, the item of $675.07, "for assault and breach of my civil and equal rights," was not contained in the bill of particulars mentioned in the prayer of the bill; and, being presented to the clerk, he informed the plaintiff that the court had no jurisdiction of such a suit, and advised him against filing it,—among other things, telling him that the amount sued for was below $2,000. Afterwards, on the 9th of December, 1898, the plaintiff filed an amended bill, as follows:

"Amendment to Bill.

"To the Chancellor of the United States Circuit Court for the Western District of Tennessee.

"W. A. Brinkley, Complainant, v. Louisville & Nashville R. R. Co., Defendant.

"Complainant obtained judgment against defendant in justice court for $100. Defendant made little or no defense, but appealed to the circuit court, and upon trial in same, by written instrument, acknowledged the guilt of the whole transaction. Wherefore complainant prays for debt as follows, to wit:

| | | |
|---|---|---|
| By judgment of lower court | $ 100 | 00 |
| Interest on same from June 15, '87 | 69 | 00 |
| Additional for assault and breach of my civil and equal rights | 675 | 07 |
| For injury to my health, as the result of the false judgment and the persecuting spirit in the trial in the circuit court | 1,200 | 00 |
| Fare from Brownsville and return, of three witnesses, nine trips | 30 | 60 |
| 36 days for 3 witnesses, $1.50 per diem | 54 | 00 |
| | $2,128 | 67 |

"This amendment pertains to that part of original bill that refers to the amount of judgment of the lower court, and the interest pertaining thereto, etc.

"W. A. Brinkley.

"Sworn to and subscribed before me this 9th day of December, 1898.

"W. B. Weisiger, D. C."

On the 14th of December, 1898, a certified transcript of the proceedings before the justice of the peace, and the appeal in the circuit court of Shelby county, was filed by the plaintiff, which shows, briefly, the summons of the railroad company before the justice of the peace, which was executed on the 25th of July, 1885. The case was set for trial, and the plaintiff had judgment on the 31st day of July, 1885, for $100. It then shows that there was an appeal by the railroad company to the circuit court of Shelby county, but nothing else is shown by the transcript, except the deposition of one Gividen taken in behalf of the defendant. So much of the proceedings in the circuit court as the plaintiff chose to file was evidently copied by the plaintiff himself, and certified by the clerk. It appears, however, from the bill itself, and subsequently otherwise, in the record, that there was a trial in the circuit court before a

jury, with a verdict and judgment for the defendant railroad company against the plaintiff. The precise date of this judgment does not appear, but it was probably at the September term, 1885, of the circuit court, to which the appeal was taken.

On the 2d of January, 1899, the defendant appeared by its solicitor, and moved to dismiss this cause for want of jurisdiction, which was done. Whereupon, within due time, the plaintiff filed, on April 1, 1899, his prayer for appeal, as follows:

"To Judge in Equity of the United States Circuit Court.

"W. A. Brinkley, Memphis, Tenn., Resident of San Joaquin County, **California**, Complainant, v. Louisville & Nashville R. R. Co., Defendant.
(No. 529 R. D.)
"Prayer for Appeal.

"Your honorable court dismissed the aforesaid bill in equity March 16, 1899, from which decree, and from all 'other decrees made in this court at the present term, your complainant prays an appeal to the next term of the United States circuit court of appeals, at Cincinnati, Ohio. Your appellant, being not a resident of the state of Tennessee, and having nothing upon which to give the required bond, prays, also, to be allowed to take the pauper's oath.

"W. A. Brinkley."

On the 5th of April, 1899, he also filed what is styled "A Bill of Exceptions," and with it presents for filing what he calls "Exhibit A" to the bill of exceptions, and another paper called an "Addenda to the Appeal and Petition for the Same." The bill of exceptions is sworn to before a notary public, and commences as follows: "Your appellant, W. A. Brinkley, respectfully prays this appeal to your honorable court against the above respondent in a bill in equity from the United States circuit court, Memphis, Tenn. The appeal is prayed on the following grounds, which shall constitute the bill of exceptions in this case, to wit." It is addressed to the "Honorable Judges of the United States Circuit Court of Appeals for the Sixth Judicial District, Cincinnati, Ohio." Possibly this was intended as an assignment of errors in the appellate court. At all events, in numbered paragraphs, like the bill, it states chronologically the "history of the case," commencing with the plaintiff's purchase of a first-class ticket of the railroad company; giving circumstantially, with intermixture of argument and indignant protest against the defendant's conduct in ejecting him from the car, a relation of the injurious effects upon the plaintiff's legal rights, his health, his mental prostration, and the struggles he has made during all these years for some redress, including his departure from the state, his residence in California, and his subsequent return to renew the struggle by this proceeding. It states that he had expended over $300 in trying to redress his grievance. It repeats the items of the demand and claim against the company as found in the bill, complains that the respondent had used its influence to prevent him from obtaining copies of papers in the case for use in this court, and of its unfair appeals to the jury which tried the case,—to race prejudice,—and, in a somewhat pathetic manner, embodies the complaints against all this alleged injustice. Coming to the proceeding here, the document states that as soon as the complainant could, after a recovery of his health in California, he came to this court, and "prayed a revival of judgment in the above-named cause, with the following results." The document then repeats substantially the statements of the bill, the plaintiff's trouble about getting summons upon the defendant, and the fact that the bill was dismissed for want of jurisdiction. It states that the bill was dismissed "because judgment complained of was rendered by the state court, over which the former had no jurisdiction." It then, erroneously, or through misapprehension of what was said, states that the judge dismissing the bill "instructed your appellant that his only remedy was to appeal, which he was at liberty to do." The document then very circumstantially relates all the acts and doings of the plaintiff and of the respondent's attorney, of the clerk, and all about the issuance of an execution for the costs upon the judgment dismissing the bill, including everything up to the order dismissing the bill. It then complains that "the appellant is deprived of his lawful and just rights by superior power, skill, and influence of the respondent"; stating "that it was beneath the dignity" of the respondent to appear in the case, and that its attitude in both this court and the state court was such

that it confessed the facts without defending them, except by an appeal to race prejudice, and its power to wield same against the plaintiff in a community where the sentiment is prevalent, and also making some quotations from the language of defendant's counsel in the trial before the jury, appealing to their prejudices, and showing that it has followed this policy of nondefense and keeping him out of court from the commencement. Presumably referring to the judgment of this court dismissing the suit, it says, "It is not in accordance with the facts of the case, is a nullity, and has no sanction in law." It then repeats the claim for the $100 and interest thereon allowed by the justice of the peace, and the balance of the $500 prayed for in the original suit, and the additional items of damages and expense set forth in the bill; saying that the appellant believes that the amounts designated are reasonable, equitable, and just. This document is thus stated because it really exhibits the plaintiff's cause of action, and his theory of it, better than the bill. The "Addenda" seems to be unimportant, except as a renewed complaint that the plaintiff had been delayed 90 days in getting his summons executed, that the bill was dismissed for want of jurisdiction before his complaints and motions about the summons or subpœna to answer were heard, and a renewed complaint that an execution was issued on the judgment for costs. Exhibit A to the bill of exceptions seems to be a transcript made by the plaintiff himself of the papers in this case, including the transcript from the circuit court of Shelby county on appeal, and the depositions filed therewith, which give a detailed statement of the occurrence on the train when the plaintiff was ejected from the first-class coach, and compelled to ride in the coach assigned to colored people. Presumably this transcript has been prepared with a view of saving costs, and of having it certified upon appeal.

W. A. Brinkley, pro se.
J. P. Houston, for defendant.

HAMMOND, J. (after stating the facts as above). This is an application for an appeal on the pauper's oath, which ought to be disallowed, even if the appeal were sought with the usual security by bond. But I have been very much perplexed to know whether a court or judge ever should or can refuse an application for an appeal from a final order, that being a question which properly belongs to the appellate court to determine. But inasmuch as the applicant has ample remedy to apply to another judge, or, it may be, for a mandamus, I have concluded to deny this appeal upon the ground that the case is not only vexatious, but is so obviously frivolous, and certainly beyond the jurisdiction of the court, original or appellate, that it should not be entertained at any stage whatever. Surely the courts have inherent power to protect themselves against the infliction of frivolous litigation, acting with all due regard for the right of the citizen to resort to them with the utmost freedom for the redress of any grievance, real or imaginary. And it seems to me that they are not compelled always to accept every suit offered to be filed or begun, and always to allow it to proceed through all the stages, original and appellate, in order that it may be formally determined only at the end whether there be a grievance, real or imaginary, that the courts should investigate, or have the jurisdiction to entertain. That is certainly the general rule, and adherence to it is necessary to protect the citizen against the possibility of oppressive denial of resort to the courts. Still, there are limitations, and this power of rejection at the threshold is not more liable to abuse than the same rejection at the end of the bootless litigation; and there is the remedy of supervision by mandamus to compel the court or judge to admit the suit to the court. Fost. Fed. Prac. § 401. Perhaps, however, the remedy of

initial rejection would have been better placed if this bill in equity had been refused a place on the files in the first instance, or if a motion to strike it from the files had been made and granted, rather than by a disallowance of a petition for appeal from the final order dismissing it for want of jurisdiction. Yet, if the power to so deal with it exists at the beginning, there is no injustice in applying the remedy at any stage in the progress of the litigation. As explanatory of the existence of such a suit, the condition of the record, and the present necessity for dealing with it in the manner proposed, it is proper to state that the plaintiff is a colored man conducting his own case, with whom the court has been more considerate than perhaps it would have been if counsel had been conducting it for him. Indeed, it seems quite incredible that any lawyer would have instituted such a suit,—certainly not in form and substance as it appears by this record. Also, the court has no doubt that the plaintiff feels keenly the wrong that was done him by ejection from the railway car in which he was riding, and that the hopelessness of the remedy which he seeks by this suit is quite incomprehensible to him. It would be plain to any lawyer he might consult, and perhaps that is the reason why he is without counsel to represent him. He appeared on the first day of the term, holding a paper which he said was a license from the supreme court of California to practice law, and asked his own admission to the bar. With that freedom which obtains here in admitting to the bar all who hold license, he was enrolled without question. He then filed this "bill of equity." The clerk advised him not to file it, and foretold to him its inevitable fate; but he persisted, as he has done throughout, in not taking any advice,—in not accepting any information against his own belief that he had a wrong which he knew how to redress, and that he was pursuing a proper remedy. He certainly has the right, under the statute, to personally appear and conduct his own suit without the aid of counsel. Rev. St. § 747. He seems somewhat acquainted with the forms of legal procedure, but perverts them in their application, because he is not at all familiar with the legal principles controlling his supposed rights or remedies, or the practice of the court in enforcing them; the whole proceeding, in consequence, being very crude. But the court, being disposed to overlook all this, has acted with such indulgence as would give effect to the statute allowing a litigant to conduct his own case.

Certainly, in a court of equity, the power always existed to refuse to entertain vexatious and frivolous bills. Mr. Daniell, in the first edition of his Chancery Practice (that edition which describes the particular practice to which equity rule 90 binds us), states that it is necessary that a solicitor shall sign, and that he ought to prepare, the bill; none being allowed to be filed without such signature. This is the guaranty to the court that the bill is not improper to be filed, in the essential qualities that it shall not be scandalous, beneath the dignity of the court, and the like, and as a preliminary assurance against frivolity and vexation. He says that before Sir Thomas More's time, when the requirement of the signature of counsel began, "It seems the practice was for the bill to be examined by one of the masters in chancery, in order that he might consider whether the matter contained therein was fitter to be dismissed by original, or re-

tained by subpœna." 1 Daniell, Ch. Prac. 409; Id. 402, 461. If the bill be "beneath the dignity of the court," as where the subject-matter of the litigation be under £10, it will not be entertained; and it seems that "if a bill is brought for a demand which, by the rule of the court, cannot be sued for, the defendant may either demur to it on the ground that the plaintiff's demand, if true, is not sufficient to ground a decree upon, or he may (which is the more usual course) move to have the bill dismissed, as below the dignity of the court." Id. 432; Id. (5th Ed.) 312. And see note 1, where the American cases are cited to the point that counsel, before signing the bill, must satisfy himself "that the bill stated a case in which the plaintiff might be entitled to relief, set forth with so much regard to the essential rules of pleading, and praying relief in such manner, as to entitle it to the consideration of the court." Davis v. Davis, 19 N. J. Eq. 180. And this object of the signature of counsel is especially set forth in our federal equity rule 24. If the bill, notwithstanding these precautions, gets upon the record, a motion is proper to strike it from the files, which the court may do of its own motion if the signature of counsel is wanting. 1 Daniell, Ch. Prac. (5th Ed.) 307, 309; Id. 312; Id. 314, note 5, where it is stated that it is a fundamental rule in all bills that they must state a case within the appropriate jurisdiction of the court, and the common and familiar rule that in the federal courts of equity the diversity of citizenship must appear in the bill is cited in illustration. It has been especially ruled that a bill may be ordered to be taken from the files if vexatious or illusory. 1 Daniell, Ch. Prac. (5th Ed.) 399, citing Mortlock v. Mortlock, 20 Law T. (N. S.) 773; Seaton v. Grant, 2 Ch. App. 459, 464; Robson v. Dodds, L. R. 8 Eq. 301; Fisher v. London Offices Co. (1870) Wkly. Notes, 113. The trouble here is that the guaranty found in the signature of counsel, against vexatious, frivolous, and otherwise unworthy bills, developed, as we see, for the very purpose of precautionary assurance against entertaining or admitting them at the beginning, has been abrogated by our own Revised Statutes, § 747 (Act Sept. 24, 1789, c. 20, § 351 [1 Stat. 92]), securing to citizens the right to "plead and manage their own causes personally." See 1 Hoff. Ch. Prac. 97; 12 Jur. 313. And, so far as we can see, neither by statute nor rule has there been any substitute for that guaranty when the parties do plead and manage their own causes, unless it be that we may go back, as I am inclined to think we may, behind the time of Sir Thomas More, when signatures of counsel were first required, and have the bills examined by a master in chancery or the clerk. 1 Daniell, Ch. Prac. 409, supra. At all events, as was remarked by Mr. Justice Giegerich, of the supreme court of New York, in the case of Byrne v. Byrne (not yet reported, except in the newspapers), where a woman was exercising her right of pleading and managing her own cause, while "it is her indisputable privilege to conduct her own case without professional assistance, the consequences cannot be visited upon the defendant."

No case has been found authorizing a court or judge to disallow an appeal or to refuse to sign a citation because the suit is frivolous or vexatious, and should not have been allowed a filing at the start; but the principle remains the same as at the beginning, and the

reason for rejecting the suit altogether still exists. The judge, in allowing the appeal and signing the citation, does not perform a ministerial act, and has some discretion; for, unlike a writ of error, the appeal is not a matter of course. Fost. Fed. Prac. § 401. This appears, on the face, to be an impossible suit and an impossible appeal, and why should it not be stricken from the files at one time as well as another? The refusal of the appeal is tantamount to that, and the remedy by mandamus for any wrong done is the same. The supreme court protects parties against frivolous appeals from money decrees by superadded damages, under its rule 23, which indicates that they should not be encouraged, at least. Mr. Justice Field, at the circuit, refused to allow an appeal and to sign a citation, pro forma, where he was satisfied that the case was not subject to appeal, saying:

"We might with equal propriety sign a citation upon an appeal, under the twenty-second section of the judiciary act, where the matter in dispute is less than the sum or value of two thousand dollars." San Francisco v. U. S., 4 Sawy. 553, Fed. Cas. No. 12,316, at page 376.

It is true that that appeal was disallowed because the case was not appealable, but that was a matter for the supreme court itself, as well as this. The decision shows that the allowance of the appeal is not a matter of course, and, if it may be disallowed for one good cause, it may be for another. Certainly there is danger, in the exercise of such a power, of usurping, in a sense, the more appropriate authority of the appellate court, and it should never be done except in the plainest cases; but if the discretion or authority to refuse the appeal exists, and may in the given case be justified on fairly sure grounds, there is no more objection to its exercise than to the exercise of any other power involving discretion, for surely the right to persist obstinately in frivolous and vexatious litigation is not an absolutely unqualified privilege, and we have shown that, at least, it is subject to the limitation here imposed at the original institution of the suit. Here one has only to read the statement of the plaintiff's case, as he makes it, to see how utterly impossible the suit is, and how hopeless it seems, to any mind except his own, which is probably unbalanced on this particular subject by long reflection on the outrage, as he sees it, of compelling him, with a pistol, to sit in a particular car, which was disagreeable to him because it was the smoker, and not allowing him to use the other car, set apart for white passengers. His "Bill of Exceptions" is unknown to the practice of a court of equity. 2 Daniell, Ch. Prac. 1120, and note; Ex parte Story, 12 Pet. 338; Johnson v. Harmon, 94 U. S. 372. But it is really a relation of his wrongs; an argument for his equal rights, and against his exclusion from the car because he is a negro; a protest against the violence, insult, and brutality of his coercion; and an appeal to this tribunal against it all, and against the superior influence and power of the "great corporation" which has injured him. Evidently it is written to explain his case, to support his bill, and he seeks, under the perverted form of a bill of exceptions, to get before the court what he should have to show by proof, on issue made by bill and answer.

Taking it as an amended bill, and treating the informal case he

makes as well made, and the plaintiff cannot see that his cause of action is forever barred by the final judgment of the state court and jury rendered against him 14 years ago; that his only remedy was by a writ of error or appeal from that judgment to the supreme court of the state, and that, having taken none, he is now without further remedy there or elsewhere, certainly after this great lapse of time; that the federal court has no jurisdiction by "a bill in equity" to "revive" the judgment of the justice of the peace for the $100 given in his favor, with interest, superadding the items of further damage not then claimed, but set out in his bill; that a federal court can have no jurisdiction at all to thus interfere with the final judgment of a state court; that there is no ground shown for equitable relief; or, that his bill does not show, and makes no attempt to show, any diversity of citizenship to give a federal court jurisdiction. All this was kindly explained from the bench at the time of dismissing the bill, but none of it will the plaintiff accept; and, with an admirable courage and persistency in the defense of his civil rights, as he understands them, he proposes to continue the fight, and elaborately prepares for an appeal, and asks it on the pauper's oath. Apparently, he has not the least doubt that he has a good case, and that he will win whenever he can be heard by a tribunal that will do him justice; but it is none the less frivolous and vexatious, and it would be a charity to him to deny the appeal, even if he were willing and able to pay all the cost and expense.

But if the appeal may not be denied on that ground, still it properly may be denied to him that he shall prolong the struggle as a pauper, taking the oath required by the statute in that behalf (Act July 20, 1892, c. 209; 27 Stat. 252). Recently, in a bankruptcy case, under a statute simply granting the privilege to proceed in forma pauperis, the court held that under that statute, as always, in all courts, poor persons were not allowed the privilege merely upon a willingness to take the oath of poverty; that it was not an unqualified right, even when granted by a statute, seemingly without limitation; and that the court might inquire into the facts, and determine if it were a proper case to allow the privilege. In re Collier, 93 Fed. 192. It was always the rule of the chancery practice that the privilege of suing in forma pauperis would not be allowed unless it should appear that the plaintiff had a case that, on the face of it, was one in which the redress or relief asked might reasonably be expected; and counsel assigned must underwrite a certificate "that he conceives the plaintiff has just cause to be relieved touching the matter of the petition for which he had exhibited his bill." Furthermore, if the suit should appear to be frivolous or vexatious after it had been allowed to be filed, the plaintiff was dispaupered and the bill dismissed. The plaintiff was also guilty of contempt for which he might be committed, as the pauper might otherwise "be guilty of great oppression"; and "it is also laid down in a book of considerable authority that paupers bringing vexatious suits, being detected and the court informed thereof, they shall not only be dismissed, but punished; and in Tidd's Practice it is said that, at law, if a pauper be nonsuited he shall pay costs or be whipped, but this punishment does not appear to have been ever inflicted." 1 Daniell, Ch. Prac. (1st Ed.) 40–50; Id. 44;

Id. (5th Ed.) 37–44; 7 Jur. 212. There is an interesting and instructive article, of recent date, relating to an inquiry into the judicial abuse by an English colonial court of allowing suitors to bring oppressive suits, in forma pauperis, "who could well afford to pay." There was a royal commission, one of whom was Sir Frederick Pollock, so well known in our country, and in their report they set out the English law on this subject, and say:

"Courts of justice, by ample experience, have found it needful to take strict precaution against the too facile admission of speculative and vexatious claims." 145 Westm. Rev. (1896) 237, 239; Id. 388.

This strict precautionary practice, designed to protect defendants against the oppression of vexatious suits carried on without expense, and in our day unpunishable by any penalty, grew up in every court under the statute of 11 Hen. VII. c. 12. Applicable originally only to courts of law, but from the first voluntarily followed by all the courts, it was just as unqualified as any of our American statutes in granting the privilege that "every poor person or persons which have or hereafter shall have cause of actions against any person or persons, within this realm, shall have writs and writs original, and writs of subpœna according to the nature of their causes, therefor nothing paying for the seals of the same, nor for the writing of the same writ and writs to be hereafter sued; and the justices shall assign to the same poor persons counsel learned by their discretions, which shall give their counsels, nothing taking for the same, and shall appoint attorneys for the same poor persons, and all other officers requisite and necessary to be had for the speed of the said suits to be had and made, which shall do their duties without any reward for their counsels, help and business in the same," which was granted because "the king, our sovereign lord, of his most gracious disposition, willeth and intendeth indifferent justice to be held and ministered according to his common laws to all his true subjects, as well to the poor as rich, which poor subjects be not of ability or power to sue according to the laws of this land for the redress of wrongs and injuries to them daily done, as well concerning their persons and their inheritance as other causes." 1 Daniell, Ch. Prac. (1st Ed.) 41. The ancient statute is quoted here to show that, notwithstanding its imperative commands, the courts at once established by construction the essential safeguards against its abuse above mentioned, and which are pointed out by the text writers and the cases. Bradford v. Bradford, 2 Flip. 280, Fed. Cas. No. 1,766; Roy v. Railroad Co., 34 Fed. 276; In re Collier, 93 Fed. 191; Boyle v. Railroad Co., 63 Fed. 539; McDuffee v. Railroad Co., 82 Fed. 865; Columb v. Manufacturing Co., 76 Fed. 198; Wickelman v. A. B. Dick Co., 29 C. C. A. 436, 85 Fed. 851; Whelan v. Railroad Co., 86 Fed. 219; Desty, Fed. Proc. (9th Ed.) § 335 et seq. From these authorities it will be seen what is meant by our federal statute of 1892 when it says that the court may assign counsel "if it deems the cause worthy of a trial," and when it directs that it shall dismiss the cause "if the court be satisfied that the alleged cause of action is frivolous or malicious." Act July 20, 1892, c. 209, § 4 (27 Stat. 252); Whelan v. Railroad Co., supra. Counsel might have been assigned in this case if the plaintiff, exercising his

statutory right to plead and manage his own cause personally, had not also taken care to indicate that he was himself a lawyer capable of managing it professionally.

It has been ruled in the Fifth circuit that Act July 20, 1892, c. 209 (27 Stat. 252), above mentioned, does not authorize an appeal in forma pauperis, but only applies to the court of original jurisdiction. The Presto, 93 Fed. 522. It was ruled otherwise in the First circuit. Columb v. Manufacturing Co., 76 Fed. 198. And the question has been pretermitted in the Second circuit. Wickelman v. A. B. Dick Co., 29 C. C. A. 436, 85 Fed. 851. I am not aware of any case where the statute has been construed upon this point by the supreme court or the court of appeals in this circuit, but it has been ruled to apply to writs of error and appeals by a judgment at the circuit, and it is a fact that the practice of the circuit court of appeals is to entertain a resort to that tribunal in forma pauperis. Fuller v. Montague, 53 Fed. 206. The same question arose under the ancient statute above quoted. In Taylor v. Bouchier, 2 Dickens, 504, it is stated by Mr. Dickens to have been decided that a pauper could not appeal, and that the proposition was assented to! by the bar; but in Bland v. Lamb, 2 Jac. & W. 402, Lord Eldon said that it was a very singular proposition, and that he could not see why, because a party was poor, the court should not set itself right, and he made an order that the appellant should be at liberty to prosecute the appeal in forma pauperis. See Fitton v. Macclesfield, 1 Vern. 263; 1 Daniell, Ch. Prac. (1st Ed.) 43, 44; Id. (5th Ed.) 40, citing, also, Bolton v. Gardner, 3 Paige, 273. But where he has not already been admitted as a pauper the order admitting him can only be made in the court of appeal, and the ordinary certificate of counsel is not sufficient, but it must be stated that there are special and strong grounds for the appeal. 1 Daniell, Ch. Prac. (5th Ed.) 40; 2 Daniell, Ch. Prac. (5th Ed.) 1482; Drennan v. Andrew, 1 Ch. App. 300, and note; Seton, 1271; Clarke v. Wyburn, 12 Jur. 167; Heaps v. Commissioners, Id. 167, note; Bradberry v. Brooke, 25 Law J. Ch. 576, 4 Wkly. Rep. 699; Crouch v. Waller, 4 De Gex & J. 43, 5 Jur. (N. S.) 326; Grimwood v. Shave, 5 Wkly. Rep. 482. And see Philips v. Rudle, 1 Yerg. 121, where the old English statute and cases are considered and followed in the construction of the Tennessee statute. Andrews v. Page, 2 Heisk. 634.

On the whole, I have concluded not to allow the appeal or sign the citation in this cause, where the plaintiff, however naturally or justifiably cherishing resentment for 14 years, is seeking the "revival" of a now impossible litigation. I have been thus careful in reaching this conclusion, not only to satisfy my own judicial conscience that no substantial right is denied him, but because the plaintiff, once a minister and now a lawyer, seemingly is acting in a sincere belief that he is engaged in vindicating himself and his race in this matter, and because he bitterly complains, in the documents he files, of race prejudice on the part of the courts and juries in denying him redress. Since the transaction of which he complains, it has been authoritatively settled, whether rightly or wrongly, that the guaranty of equal rights does not prohibit a separation of the

races on railway trains by assigning to each separate cars. Plessy v. Ferguson, 163 U. S. 537, 16 Sup. Ct. 1138; Logwood v. Railroad Co., 23 Fed. 318; Railroad Co. v. Wells, 85 Tenn. 613, 4 S. W. 5; Louisville, N. O. & T. R. Co. v. Mississippi, 133 U. S. 587, 10 Sup. Ct. 348; Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18. And whatevery injury the plaintiff received in the manner of his ejection, by the use of violence, or in the matter of it, by the denial of equal accommodations with the white passengers traveling on "first-class tickets," is now past any possible redress by this suit. His refusal to accept this result gives him no new right, and the denial of this appeal does him no injustice. It would be an injustice to the officers of the court to compel them to work for him without compensation, on his taking the pauper's oath, merely to gratify his obstinate ambition to try the case he thinks he makes, but does not, in the appellate courts. It may be impossible to convince him that no injustice is done on this occasion, through race prejudice, but it is possible that others interested in sympathy with him may be convinced. Application denied.